IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ANTHONY LEE KENNON,

      Plaintiff,

v.                                                      Case No. 24-4034-JWB

DANIEL ASHLEY, JOSHUA DONCOUSE,
AUSTIN SPENCER, and CHARLES SMYSER
in their individual capacities, and
THE LAWRENCE CITY COMMISSION,
*as the governing and legislative body of the City of
Lawrence, Kansas including the Lawrence Police
Department*,

      Defendants.

**MEMORANDUM AND ORDER**

This matter is before the court on Defendants Daniel Ashley, Joshua Doncouse, Austin Spencer, and Charles Smyser ("Defendant Officers"), and the Lawrence City Commission's ("City Commission") motions to dismiss Plaintiff's complaint. (Docs. 8, 19.) The motions are fully briefed and ripe for decision. (Docs. 9, 10, 20, 25, 28, 31.) Defendant Officers' motion is GRANTED IN PART and City Commission's motion is GRANTED for the reasons stated herein.

**I. Facts**

On May 1, 2022, four Lawrence police officers, Daniel Ashley, Joshua Doncouse, Austin Spencer, and Charles Smyser, responded to a domestic violence call between Plaintiff and a woman named Destiny. (Doc. 6 ¶ 3.) Plaintiff was bruised and bloodied when Defendant Officers (except Officer Ashley) arrived. (*Id.* ¶¶ 3, 7.) Plaintiff had also expressed a desire to leave the premises, and Defendant Officers agreed to assist him. (*Id.* ¶ 3.) Two or three of the Defendant

1

Officers[1] were present at the scene for an hour. (*Id.* ¶ 7.) During this period, Plaintiff asserts that the scene was peaceful. (*Id.* ¶ 4.) However, tensions began escalating when Plaintiff started loading his personal belongings into a police vehicle. One of the Defendant Officers informed Plaintiff that there was not enough space in the vehicle for all of his belongings. Plaintiff then decided to leave his personal property on the sidewalk and find his own ride, telling the officer: "leave it right fucking here and give me my tools and I will get a ride." (*Id.* ¶ 5.) Plaintiff needed his tools, though, which were in a vehicle that Destiny had to open. (*Id.* ¶ 6.) At this point, Officer Ashley arrived at the scene. (*Id.* ¶ 7.) Destiny initially refused to open the vehicle, but eventually, decided to unlock it. (¶¶ 7, 9.) Before unlocking the trunk, Destiny claimed that Plaintiff's tools were not in it. (*Id.* ¶7.) Plaintiff asserts that Officer Ashley believed Destiny, so in response, Plaintiff told Officer Ashley that he is "dumb, a 'stupid-ass' and 'you're a bitch'" and said he was "'cowering down' to Destiny." (*Id.* ¶ 9.) He also told Officer Ashley that Destiny "isn't going to fuck you ever" and that "[he] should have sent her bitch ass to jail." (*Id.*) As he moved his tools from the vehicle to the sidewalk, he glared at Defendant Officers and said that nothing in his tools was going to hurt them.[2] (See id. ¶ 14.) (*See id.* ¶ 14.) Officer Ashley then warned Plaintiff that if he challenged his officers again, he would be arrested. (*Id.* ¶ 15.) Officer Spencer told Plaintiff to "watch out." (*Id.* ¶ 16.) In response, Plaintiff taunted Defendant Officers by stating "take me to jail . . . take me to jail." (*Id.*) Officer Ashley then started to arrest Plaintiff. (*Id.* ¶ 17.) The images included in the complaint show Plaintiff moving towards Officers Ashley and Smizer with his arms outstretched. (*Id.* at p. 13.)

---

[1] Plaintiff is not clear whether two or three officers first responded to the call. He does state that Officer Ashley arrived after two officers had been there for about an hour. (*Id.* ¶ 6.)
[2] Plaintiff includes a quote that is incoherent: "nothin in this gonna hurt you is there." (*Id.* ¶ 14.) Because the quotation is difficult to understand, the court paraphrased Plaintiff's statement to reflect what he appears to have intended to communicate.

2

Officer Ashley's report indicated Plaintiff was arrested for disorderly conduct and for the language he had used against two women and Officer Smyser. (*Id.* ¶¶ 17, 18, 43.) He reported that Plaintiff threw his belongings to the ground and directed them toward Officer Smyser's feet. (*Id.* ¶ 42.) He also reported that Plaintiff leaned in close while he glared at Officer Smyser and chested him up. (*Id.*) Officer Smyser included in his report that Plaintiff was arrested for disorderly conduct and for calling him a "bitch" and a "coward." (*Id.* ¶¶ 39, 40.) Officer Doncouse reported that Plaintiff "was becoming aggressive toward Officer Smyser." (*Id.* ¶ 41.) According to all Defendant Officers, Plaintiff engaged in aggressive conduct and name calling. Plaintiff baldly asserts that each officer made false statements in their reports about his disorderly conduct. (*Id.* ¶¶ 35, 39, 41, 42, 44.)

Officer Ashley placed him in handcuffs. (*Id.* at p. 16.) Plaintiff alleges that his arms were wrenched and squeezed backwards as he was handcuffed. (*Id.* ¶ 19.) He told Defendant Officers: "you're a coward-ass bitch." (*Id.*) He was then placed in a police vehicle. (*Id.* ¶ 20.) Plaintiff admits that he briefly yelled while Defendant Officers placed him in the back seat and secured the seatbelt. (*Id.* ¶ 21.) However, he claims that he stopped yelling. (*Id.* ¶ 21.) Plaintiff also asserts that the dividing panel which separates the front and back seats in the police vehicle was already damaged when he was placed inside of it. (*Id.* ¶ 20.) By contrast, according to Plaintiff's complaint, Defendant Officers reported that he had damaged the panel. (*Id.*) Plaintiff then asserts that Officer Ashley decided to retaliate against him for breaking the panel by ordering the WRAP restraint[3] to be placed on Plaintiff. (*Id.* ¶¶ 22, 23.) Based on the pictures, Plaintiff was taken out of the vehicle and forced to the ground onto his knees then his stomach. (*Id.* at pp. 18, 19.) At

---

[3] Plaintiff does not provide an official description or definition of a WRAP restraint. However, based on the allegations and pictures in the complaint, the WRAP restraint is a "straight-jacket device," (Doc. 6 ¶ 29), that includes a helmet. (*Id.* at p. 22).

3

some point, Plaintiff appears to have been lifted back to his knees. (*Id.* at p. 20.) There is a picture from Officer Ashley's body camera showing someone grabbing and pushing Plaintiff's ear. (*Id.*) Similarly, a picture from Officer Spencer's body camera shows someone applying pressure to Plaintiff's underarm and shoulder area. (*Id.*) Two other pictures labeled as Officer Spencer's body camera footage shows a knee being applied to Plaintiff's back and his head being forcefully held. (*Id.* at p. 21.) Based on the photos, a helmet, which is part of the WRAP restraint, was placed on Plaintiff. (*Id.* at pp. 21, 22, 69.) Once the Officers had placed the WRAP restraint on Plaintiff, he was handcuffed, and the Officers placed ankle, leg, and chest restraints on him. (*Id.* ¶ 69.) Plaintiff alleges that the Officers continued to use pressure points to inflict pain after he had been subdued with the WRAP. (*Id.* ¶ 27; *see also*, images on pg. 23.) Plaintiff claims to have yelled: "you jammed your thumb into my throat," (*id.* ¶ 28); to which one of the officers replied: "it's a pressure point buddy." (*Id.*) Plaintiff asserts that Officer Ashley applied the mandibular angle pressure point maneuver to him multiple times. (*Id.* ¶ 71)

Because of the force used during his arrest, Plaintiff claims to suffer from post-traumatic syndrome, heart issues, and other residual effects. (*Id.* ¶ 72.)

Plaintiff alleges that each Defendant Officer falsified their reports to support his arrest and subsequent charges brought against him. (*Id.* ¶ 44.) The Lawrence Police Department's Office of Professional Accountability conducted an investigation into Plaintiff's arrest. (*Id.* ¶ 34.) Plaintiff asserts that it was a sham investigation initiated to conceal Defendant Officers' conduct and confirm their incident reports. (*See id.* ¶¶ 35, 36.) The Office of Professional Accountability purportedly determined that Officer Ashley did not violate a department policy and that he and Officer Smyser did not use excessive force. (*Id.* ¶ 36.) Chief of Police Rich Lockhart did not punish any Defendant Officer for their alleged misconduct. (*Id.* ¶ 37.) The Douglas County

4

prosecutor charged Plaintiff with domestic battery, battery, disorderly conduct, and interference with law enforcement. (*Id.* ¶ 85.) However, the charges were dismissed by the State on December 21, 2022. (*Id.* ¶ 87.)

Plaintiff asserts six claims: two against the City Commission and four against Defendant Officers in their individual capacities. City Commission moved to dismiss one of the two claims against it, and Defendant Officers moved to dismiss all four claims against them in their individual capacities. The court addresses each claim in turn.

## II. Standard

A complaint must contain enough facts to state a claim for relief that is plausible on its face in order to withstand a Rule 12(b)(6) motion to dismiss. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007)). At the motion-to-dismiss stage, a reviewing judge accepts all well-pleaded allegations in the complaint as true. *Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty., Colo.,* 771 F.3d 697, 700 (10th Cir. 2014). The reviewing judge also views all well-pleaded facts and the reasonable inferences derived therefrom in the light most favorable to Plaintiff. *Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008). Conclusory allegations, however, have no bearing upon the court's consideration. *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007). Rule 12(b)(6) "does not require that Plaintiff establish a prima facie case in [its] complaint, but rather requires only that the Plaintiff allege enough factual allegations in the complaint to set forth a plausible claim." *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1171–72 (10th Cir. 2015) (internal citations omitted). In the end, the issue is not whether Plaintiff will ultimately prevail, but whether Plaintiff is entitled to offer evidence to support his claims. *Beedle v. Wilson*, 422 F.3d 1059, 1063 (10th Cir. 2005).

### III. Analysis

**A. Section 1983 Claim for Retaliatory Arrest for Protected Speech – Individual Officers**

Plaintiff's first claim against Defendant Officers in their individual capacity is a 42 U.S.C. § 1983 First Amendment retaliation claim. He argues that he was retaliated against—when he was arrested—for engaging in constitutionally protected speech. (*See* Doc. 6 ¶ 94.) The elements of a First Amendment retaliation claim are: "(1) that the plaintiff 'was engaged in constitutionally protected activity'; (2) that the defendant's actions caused the plaintiff 'to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity'; and (3) that the 'defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.'" *See Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (citations omitted).

Relying on Plaintiff's lengthy complaint, Defendant Officers argue the retaliation claim should be dismissed because they lawfully arrested Plaintiff for disorderly conduct. (Doc. 20 at 8.) Accordingly, if Plaintiff's complaint demonstrates that Defendant Officers were substantially motivated to arrest him for his actions overall, including his physical behavior and statements, then he failed to plausibly state a claim for First Amendment retaliation.

A lawful arrest without a warrant must be based on probable cause that unlawful activity is ongoing or has already occurred. *Mann v. Purcell*, 718 F. Supp. 868, 875 (D. Kan. 1989). "Probable cause exists where the facts and circumstances within an officer's knowledge, and of which he had reasonably trustworthy information, are sufficient to warrant a prudent man in believing that an offense has been or is being committed." *Id.* Under Kansas law:

> (a) [d]isorderly conduct is one or more of the following acts that the person knows or should know will alarm, anger or disturb others or provoke an assault or other breach of the peace:

6

>    (1) Brawling or fighting;
>    (2) disturbing an assembly, meeting or procession, not unlawful in its character; or
>    (3) using fighting words or engaging in noisy conduct tending reasonably to arouse alarm, anger or resentment in others.

K.S.A. § 21-6203. Notably, if speech alone is supporting a conviction for disorderly conduct, then Kansas requires the speech be fighting words. *See Mann*, 718 F. Supp. at 875 (citing *Kansas v. Huffman*, 228 Kan. 186, 192, 612 P.2d 630, 635 (1980)). Disorderly conduct in each situation depends on the totality of the circumstances. *See id.* (citing *State v. Beck*, 9 Kan. App. 2d 459, 462, 682 P.2d 137, 140 (1984)).

Here, Plaintiff's arrest was based on both physical acts and speech. The police reports—which Plaintiff refers to in his complaint—indicate that he engaged in noisy conduct when he threw or placed his tools on the ground. (Doc. 6. ¶ 42.) Regardless of whether he *threw* them toward Officer Spencer's feet, he certainly placed his tools near Officer Spencer's feet. Based on the incident reports, Plaintiff also attempted to chest bump Officer Spencer and glared at him. (*Id.*) He allegedly glared at all four Defendant Officers as well. (*Id.* ¶ 14.) He engaged in language that would arouse anger: calling Officer Ashley a bitch and coward. (Id. ¶ 9.) When Officer Ashley warned Plaintiff to calm down, he refused to listen and taunted Officer Ashley by exclaiming "Take me to jail." (*Id.* ¶¶ 15, 16.) Plaintiff also admits to engaging in noisy conduct by yelling at Destiny to open the vehicle, (*Id.* ¶¶ 6, 7 and images p. 3), and inappropriately commenting on her having sexual relations with Officer Ashley. (*Id.* ¶ 9.) Moreover, the pictures in the complaint demonstrate that as the Defendant Officers moved to handcuff Plaintiff, he was walking towards them with his arms up. (*Id.* p. 13.) After he was handcuffed, Plaintiff allegedly yelled while he sat in the back of the police vehicle—he eventually stopped. (*Id.* ¶ 21.)

Indeed, Plaintiff does not disagree that he was disorderly because he asserted these facts in his lengthy complaint. He admits to glaring, taunting, and calling Defendant Officers names. He also admits to yelling and speaking badly about Destiny when she would not unlock the vehicle. Plaintiff's only refutation that Defendant Officers had probable cause to arrest him for disorderly conduct are conclusory assertions that they lied in their incident reports and the Office of Professional Accountability conducted a sham investigation.

Based on the totality of the circumstances that lead to his arrest, the court concludes that Defendant Officers had probable cause to arrest him for disorderly conduct. Hence, Defendant Officers' decision to arrest Plaintiff was not substantially motivated to chill his First Amendment right to freedom of speech.[4] Therefore, Defendant Officers' motion to dismiss Plaintiff's § 1983 claim for free speech retaliation is granted.

### B. Section 1983 Claim for Unlawful Arrest and Failure to Intervene – Individual Officers

Plaintiff's second cause of action against Defendant Officers in their individual capacities is a 42 U.S.C. § 1983 claim alleging unlawful arrest and failure to intervene during an unlawful arrest in violation of the Fourth Amendment. However, as discussed in Section III.A, Plaintiff was lawfully arrested for disorderly conduct. Hence, Plaintiff cannot maintain an unlawful arrest claim. Furthermore, because Defendant Officers had probable cause to arrest Plaintiff, he cannot plausibly allege a failure-to-intervene claim. *See Allen* v. *Linn Cnty, Bd. of Commissioners*, No. 2:23-CV-02453-HLT-BGS, 2024 WL 3066168, at *11 (D. Kan. June 20, 2024) (dismissing the plaintiff's failure-to-intervene claim because he failed to allege a constitutional violation).

---

[4] The court does not address whether Plaintiff's statements were fighting words or protected speech because he engaged in other disorderly conduct.

Therefore, Defendant Officers' motion to dismiss Plaintiff's unlawful arrest and failure-to-intervene claim is granted.

### C. Section 1983 Claim for Malicious Prosecution – Individual Officers

Plaintiff also raises a Fourth Amendment § 1983 claim[5] against Defendant Officers for malicious prosecution. The elements of a malicious prosecution claim are: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Montoya v. Vigil*, 898 F.3d 1056, 1066 (10th Cir. 2018).

Defendant Officers argue that Plaintiff failed to plead facts supporting elements one and three. They first argue Plaintiff insufficiently pleaded that judicial proceedings began in the absence of probable cause that he committed a crime in their presence. (Doc. 20 at 15–16.) Second, Defendant Officers assert that there was a break in the causation chain because the Douglas County prosecutor decided to bring criminal charges against Plaintiff, not the officers. (*See id.* at 16.)

As already discussed, Plaintiff's long form complaint established that he was arrested for both speech and disruptive conduct. Upon review of the totality of the circumstances, the court concluded that Defendant Officers had probable cause to arrest Plaintiff for the crime of disorderly conduct. However, even if there were questions surrounding whether probable cause existed, the court would find in Defendant Officers' favor on their second argument. Typically, there is a break in the chain of causation between arrest and prosecution because the prosecutor is making an

---

[5] Plaintiff does not cite which amendment serves as the basis for his malicious prosecution claim. However, the Tenth Circuit has recognized that the Fourth Amendment underpins a § 1983 claim for malicious prosecution prior to trial. *See Margheim v. Buljko*, 855 F.3d 1077, 1085 (10th Cir. 2017).

independent decision to bring formal charges against an individual. *See Sodaro v. City of Denver*, 629 F. Supp. 3d 1064, 1078 (D. Colo. 2022). By contrast, when arresting officers conceal or mispresent facts to a prosecutor, the element of causation may be established because their misrepresentation is causing a person's prosecution. *See id.*

Here, however, the Douglas County prosecutor charged Plaintiff with "domestic battery, battery, disorderly conduct, and interference with law enforcement . . . ." (Doc. 6 ¶ 143.) Plaintiff argues that the Defendant Officers caused this prosecution because they made false statements in their police reports about Plaintiff's conduct that led to his arrest. (Doc. 6 ¶¶ 35, 39, 41, 42, 44). Plaintiff's assertions about the Officer Defendants falsifying their incident reports are conclusory, though. He does not allege that Defendant Officers pressured the prosecutor to bring the charges, and the facts from Plaintiff's lengthy complaint negate his assertions of false statements by Defendant Officers because his own allegations indicate he engaged in disorderly conduct prior to his arrest.

Therefore, Defendant Officers' motion to dismiss Plaintiff's § 1983 malicious prosecution claim is granted.

**D. Section 1983 Claim for Excessive Force – Individual Officers**

Plaintiff also raises a Fourth Amendment § 1983 claim for excessive force against each Defendant Officer.

Plaintiff's excessive force claim is based on the following facts. Officer Ashley began the arrest procedures against Plaintiff. (*Id.* ¶ 17.) As Defendant Officers arrested Plaintiff, they allegedly wrenched and squeezed his arms backwards while they handcuffed him. (*Id.* ¶ 19.) Defendant Officers then placed him in a vehicle. (*Id.* ¶ 20.) Plaintiff admits that he briefly yelled while being placed in the back seat and while the seatbelt was properly secured. (*Id.* ¶ 21.)

However, he claims to have stopped yelling. (*Id.*) According to Plaintiff, the panel dividing the front from the back of the police vehicle was damaged before he was placed in the vehicle. (*Id.* ¶ 20.) He alleges in his complaint that Defendant Officers believed he damaged the panel. (*Id.*) As a result, Plaintiff asserts that Officer Ashley retaliated by ordering Plaintiff to be placed in a WRAP restraint. (*Id.* ¶¶ 22, 23.) Based on the pictures, it appears that Officer Ashley participated in forcing Plaintiff to the ground onto his knees and stomach. (*Id.* at pp. 18, 19.) Officer Doncouse also appears to have participated in forcing Plaintiff to the ground on his stomach. (*Id.* at p. 19.) At some point, Plaintiff appears to have been lifted back to his knees. (*Id.* at p. 20.) There is a picture from Officer Ashley's body camera showing someone pushing Plaintiff's ear. (*Id.* at p. 20.) Similarly, a picture from Officer Spencer's body camera shows an officer applying pressure to Plaintiff's underarm and shoulder area. (*Id.*) Two other pictures—labeled as Officer Spencer's body camera footage—show a knee being applied to Plaintiff's back and his head being forcefully held. (*Id.* at p. 21.) Based on the photos, a helmet-like device, which appears to be part of the WRAP restraint, was placed on Plaintiff. (*Id.* at pp. 21, 22.) Plaintiff was handcuffed and placed in ankle, leg, chest, and head restraints. (*Id.* ¶ 69.) Plaintiff alleges that the Officers continued to use pressure points to inflict pain after he had been subdued with the WRAP restraint. (*Id.* ¶ 27; *see also*, images on p. 23.) At one point Plaintiff claims to have yelled: "you jammed your thumb into my throat." One of the officers replied: "it's a pressure point buddy." (*Id.* ¶ 28.) This may have been when Officer Ashley purportedly applied the mandibular angle maneuver. (*Id.* ¶ 71.) Regardless, Plaintiff asserts that Officer Ashley applied this pressure point maneuver to him multiple times. (*Id.*)

Plaintiff asserts that he was listening to the Officers' commands and did not disobey them. (*Id.* ¶ 70.) He admits that he yelled when Defendant Officers first placed him in the police vehicle.

(*Id.* ¶ 21.)  However, he claims to have done so only briefly.  (*Id.*)  The images appear to corroborate that Plaintiff submissively sat in the police vehicle when he was handcuffed.  (*Id.* at p. 17.)  This was before Defendant Officers applied the WRAP restraint.  Because of the Officers' alleged excessive force, Plaintiff asserts that he suffers from post-traumatic stress disorder, heart issues, and other residual effects from the physical and psychological torment.  (*Id.* ¶ 72.)

First, the Fourth Amendment protects the rights of individuals against the use of excessive force during arrests.[6]  To evaluate excessive force claims, courts need to consider "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them."  *Wilkins v. City of Tulsa*, 33 F.4th 1265, 1273 (10th Cir. 2022) (quoting *Lombardo v. City of St. Louis*, 594 U.S. 464, 467 (2021)). The guiding factors for the court's analysis are the three *Graham* factors:[7] "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others and (3) whether he is actively resisting arrest or attempting to evade arrest by flight."  *See Tran v. City of Lawrence,* 653 F. Supp. 3d 894, 904 (D. Kan. 2023).  Additionally, to recover from individual officers in a § 1983 action for excessive force, a plaintiff needs to show that each defendant officer personally participated in the violation by identifying the officer and their conduct that allegedly violated the Constitution.  *Shrum v. Cooke*, 60 F.4th 1304, 1311–12 (10th Cir. 2023).  This particularity requirement puts an individual defendant on notice as to the claims against him and avoids confusion about claims for "collective allegations against the state."  *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011) (citation omitted).

---

[6] Plaintiff states in his complaint that the Fourth, Fifth, Eighth, and Fourteenth Amendments underpin his § 1983 excessive force claim.  Defendant Officers argue that Plaintiff raises a Fourth Amendment claim because the alleged excessive force occurred during his arrest. (Doc. 20 at 11.)  The court agrees.
[7] The three factors are from the Supreme Court case: *Graham v. Connor*, 490 U.S. 386, 397 (1989).

The court first dispenses with Defendant Officers' particularity argument. Defendant Officers argue that Plaintiff's excessive force claim should be dismissed because he failed to differentiate the conduct of each individual officer. (Doc. 20 at 4, 12.) Defendant Officers are correct that Plaintiff did not parse and identify the unconstitutional conduct of each individual officer. He alleges some individual conduct: for example, Officer Ashley purportedly applied the mandibular angle maneuver after Plaintiff had been subdued. (Doc. 6 ¶ 71.) But Plaintiff largely pleaded his excessive force claim by focusing on the Officers' collective conduct. As the images demonstrate, though, Plaintiff endured a chaotic arrest.

After he was subdued and placed into the back of a police vehicle, Defendant Officers removed him because they believed he had damaged the dividing panel. They forced him facedown onto the ground, lifted him back up again, and then placed him in the WRAP restraint, which included a helmet that partially covered his face. Based on the images, all four officers engaged in the application of the WRAP restraint. The court doubts Plaintiff, or anyone, could meticulously document who was grabbing the back of his head, twisting his arms, putting him in ankle and leg restraints, and poking and prodding him. At this point in the proceeding, due to the chaotic nature of the arrest and the facts as discussed herein that suggest all four officers were involved in applying force after Defendant was handcuffed and placed in the back of the patrol car, the court concludes that the particularity requirement does not foreclose Plaintiff's excessive force claim— as discovery will most likely clarify Defendant Officers' individual actions.

Furthermore, all three *Graham* factors favor Plaintiff. The first factor is the severity of the crime. Here, Defendant Officers reported that Plaintiff was arrested for disorderly conduct, which is a misdemeanor in Kansas. *See* K.S.A. § 21-6203(b); *see Kansas v. Hamilton*, 452 P.3d 883 (Kan. Ct. App. 2019). Turning to the second factor, Plaintiff pleaded that he had been subdued

once he was handcuffed and placed him inside the police vehicle. Indeed, the images show that Plaintiff was calmly sitting in the police vehicle. (Doc. 6 at 17.) At this point, Plaintiff did not pose a threat to the officers or to others. Third, the facts do not indicate he was actively resisting arrest. To be sure, it was a chaotic arrest, but the majority of it occurred after he was removed from the police vehicle. Defendant Officers then further subdued Plaintiff by placing him in the WRAP restraint, applying pressure point maneuvers, putting a knee into his back, and squeezing and poking him. Under *Graham*, "force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest." *See Casey v. City of Fed. Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007). As pleaded, Plaintiff did not flee or resist arrest, and once handcuffed and secured in the back of the police vehicle, he was docile. Defendant Officers then unnecessarily further subdued him. Hence, the court concludes that Plaintiff plausibly pleaded an excessive force claim against all four individual officers.

Defendant Officers also raise a qualified immunity argument. Plaintiff has sufficiently pleaded that Defendant Officers violated his Fourth Amendment right against excessive force. And it is clearly established that "force is unconstitutional when used against individuals like [Plaintiff] 'who were not suspected of serious crimes, posed little to no threat, and put up little to no resistance.'" *Est. of Holmes v. Somers*, 387 F. Supp. 3d 1233, 1252 (D. Kan. 2019), *aff'd sub nom*. *Couser v. Gay*, 959 F.3d 1018 (10th Cir. 2020) (quoting *McCoy v. Meyers*, 887 F.3d 1034, 1053 n.21 (10th Cir. 2018)). Thus, the Officers' qualified immunity argument fails at this stage of the proceedings.

Therefore, Defendant Officers' motion to dismiss Plaintiff's excessive force claim is denied.

### E.  Lawrence City Commission – *Monell* Liability

Plaintiff's final cause of action is a *Monell* liability claim against the Lawerence City Commission.[8]

A plaintiff establishes *Monell* liability through this general analytical framework: "[a] policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury" and caused the constitutional violation. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). Broken down, there are three elements a plaintiff must establish: "(1) official policy or custom, (2) causation, and (3) state of mind." *Id.* These three elements are broken down in turn.

An official policy or custom can take shape in a variety of formats: a formally adopted and promulgated regulation or policy, an informal custom so widespread that it becomes a policy with the force of law, a policymaker's ratification of a subordinate's decision to "whom authority was delegated subject to these policymaker's review and approval," or a failure to adequately train or supervise employees that amounts to deliberate indifference. *See Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010); *Schneider*, 717 F.3d at 770.

Causation is established if the policy or practice is the "'moving force' behind the injury alleged." *See Brown v. Flowers*, No. 23-7006, 2023 WL 6861761, at *9 (10th Cir. Oct. 18, 2023) (quoting *Bd. of Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997)).

The final element: "state of mind," is the deliberate indifference standard. To satisfy the deliberate indifference standard, a plaintiff must demonstrate that the municipality was on notice—actual or constructive—that the policy, action, or failure to act "is substantially certain to result in

---

[8] Plaintiff includes City Commission in his claim of excessive force: identifying in parenthesis that his excessive force claims is "(AGAINST ALL DEFENDANTS)." (Doc. 6 at 46.) This claim against City Commission appears to stem from its potential *Monell* liability. Indeed, Defendant City Commission seems to have interpreted the claim as such, since it did not specifically address the excessive force claim. Thus, the court will handle Plaintiff's claims against City Commission relating to *Monell* liability in this section.

a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).

Plaintiff's *Monell* claim against the City Commission is unclear. Specifically, the court is unsure which type of policy Plaintiff alleges caused the harm. The title indicates the claim is based on a failure to train and supervise Lawrence police officers. (Doc. 6 at 51.) However, the complaint contains language alleging a *Monell* policy as both a failure to properly train and supervise as well as supervisor ratification. For example, Plaintiff asserts in his complaint that "[t]he City and its Police Department failed to properly train and supervise police officers," (Doc. 6 ¶ 163), "[t]he City failed to properly train and supervise its officers as to its Policy on probable cause for arrest, protected speech, and name calling directed towards police," (*id.* ¶ 165), and "[t]he City failed to properly train and supervise its officers as to its Policy on alternative non-violent tactics . . . ." (*Id.* ¶ 166.) He also asserts, though, that "[t]he City has ratified and approved the actions of each of the defendants as the City Police Department and these defendants continue defending and justifying all of that conduct in Mr. Kennon's criminal proceedings." (*Id.* ¶ 167.) Without further clarification, the court would remain unsure which *Monell* policy Plaintiff is relying upon for his claim against City Commission

Fortunately, Plaintiff clarified in his response briefing that the *Monell* policy forming the basis of his § 1983 claim against City Commission is a policymaker's ratification of a subordinate's decision. (Doc. 10 at 5.) "Of the five ways a municipal policy or custom may exist, *this plaintiff alleged 'ratification'* . . . ." (*Id.*) (emphasis added). Plaintiff then asserts that City Commission ratified the officers alleged misconduct when (1) the Office of Professional Accountability conducted an internal investigation into Plaintiff's arrest, and (2) Chief of Police Rich Lockhart announced that the investigation concluded the officers did not violate any

departmental policy.  (Doc. 6 ¶¶ 36.)  Because of this conclusion, Lockhart did not punish or admonish the officers.  (*Id.* ¶ 37.)  Plaintiff then argues that the failure to punish the officers caused the violation of Plaintiff's constitutional rights.  (*Id.* ¶ 38.)

By contrast, City Commission asserts that Plaintiff insufficiently pleaded a *Monell* claim by not identifying a policy or custom and failing to establish a causal nexus between the investigation or lack of discipline and the alleged constitutional violation.  Regarding the existence of a *Monell* policy, City Commission argues that Plaintiff needed to show a pattern of unconstitutional conduct. (Doc. 15 at 2.)  Accordingly, because Plaintiff relies on a single assertion of unconstitutional conduct, he has failed to plead the existence of a *Monell* policy. (*Id.* at 2–3.) Additionally, City Commission argues that Plaintiff's complaint as pleaded cannot support the element of causation in *Monell* claim. (*Id.* at 3.)  This is because the ratification conduct—the investigation and lack of discipline—occurred after the incident giving rise to Plaintiff's § 1983 claims.  Hence, under the City Commission's argument, it could not have caused the purported constitutional violations.

Here, the City's argument about Plaintiff's inability to establish causation is sufficient to dismiss Plaintiff's *Monell* claim as pleaded.  Thus, the court does not address whether Plaintiff needed to demonstrate a pattern of misconduct in order to properly identify a policy or custom under *Monell*.

For ratification to serve as the basis of *Monell* liability, a final policymaker must ratify a subordinate's actions.  *See Erickson v. City of Lakewood*, 489 F. Supp. 3d 1192, 1207 (D. Colo. 2020).  This means that a final policymaker has "retained the authority to measure the [subordinate] official's conduct for conformance with *their* policies."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (emphasis in original).  When a final policymaker approves of a subordinate's

17

action and the basis for it, they ratify the subordinate's conduct and it is "chargeable to the municipality because [the final policy maker's] decision is final." *Id.* However, the timing of a final policy maker's ratification matters.

For example, if a final policymaker ratifies misconduct by failing to adequately investigate the claim or punish an individual, others may be encouraged to engage in such behavior. Under this example, the ratifying conduct of an inadequate investigation and punishment causes subsequent constitutional violations. However, there cannot be indirect encouragement to engage in unconstitutional behavior when a subordinate official engages in misconduct before any investigation or lack of discipline. *See Lynch v. Bd. of Cnty. Commissioners*, 786 F. App'x 774, 787 (10th Cir. 2019); *see Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) ("[B]asic principals of linear time prevent us from seeing how conduct that occurs after the alleged violation could have somehow caused that violation.").

Based solely on the alleged facts from Plaintiff's complaint, basic principles of linear time prevent this court from finding that City Commission's purported inadequate investigation and discipline into Defendant Officers caused any unconstitutional misconduct toward Plaintiff. Plaintiff pleads that the City conducted a sham investigation and determined that it was unnecessary to punish the officers who allegedly violated Plaintiff's constitutional rights. (Doc. 10 ¶¶ 35, 36, 37.) This all occurred after Plaintiff was arrested and placed in the WRAP restraint. Even if the court were to conclude that City Commission's investigation and lack of discipline ratified the officer's alleged misconduct, City Commission's participation in this case occurred after Plaintiff's arrest. Thus, Plaintiff cannot attribute Defendant Officers' purported misconduct to City Commission. Furthermore, Plaintiff does not plead that there were prior constitutional

violations haphazardly handled by City Commission that could have encouraged or caused Plaintiff's alleged injuries.

Therefore, the City Commission's motion to dismiss Plaintiff's § 1983 *Monell* claim is granted.

## IV. Conclusion

THEREFORE, Defendant Officers' motion to dismiss is GRANTED IN PART, and Defendant City Commission's motion to dismiss is GRANTED. The causes of action that remain are Plaintiff's excessive force claim against Defendant Officers in their individual capacities.

IT IS SO ORDERED. Dated this 31st day of March, 2025.

/s/ Judge John W. Broomes
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE